First, from Mr. Kobach. Thank you, Your Honor. May it please the Court, I am Chris Kobach, representing the Plaintiff I.C.E. officers in the state of Mississippi. I'd like to inform the Court at the outset that as has been widely reported in the news, on November 20th, 2014, President Obama expanded the DACA directive, which is at the center of this case, to include 4 million additional illegal aliens, approximately, in addition to the 1.8 million already covered. I want to notify you that the 2014 expansion of the directive left intact all of the policies that the plaintiffs are challenging in this matter, and all of the arguments at issue in this case still apply. With leave of the Court, I'd like to spend the first half of my time addressing the jurisdictional issues and the second half of my time addressing the merits raised in the cross-appeal. Turning first to the jurisdictional arguments, it must be noted that this is a case of immense national importance in which the plaintiffs, if we are correct, maintain that this administration is ordering federal law enforcement officers to break the law and is trenching upon the constitutional allocation of powers to the legislative branch. Nevertheless, the defendants are claiming that Article III courts cannot referee this dispute because the only two parties that could plausibly have standing to bring this case either have no standing or are precluded by the Civil Service Reform Act, CSRA, from bringing their case. If the cannot be meaningfully reviewed in an Article III court. The state of Mississippi's standing, if I may look at that first, is based principally on the injury in fact of millions of dollars in state expenditures caused by allowing the state's 1,300-plus DACA beneficiaries to remain in the state. The state auditor calculated the cost, the net cost, of all illegal aliens to the state budget in 2006 to be $25 million, more than $25 million. In a subsequent private study in 2011, not only could the state auditor calculate the cost, the net cost, of all illegal aliens to the state budget in 2006 to be $25 million, more than $25 million. The private study wasn't mentioned in your complaint, was it? It was not mentioned in the complaint. We raised it subsequently when the defendants questioned the veracity or the validity of the auditor's study, and the district court judge speculated that perhaps the cost went down after 2006. How is it that we can consider what's in the private complaint, or the private study, since it wasn't in the amended complaint? I think at the motion-to-dismiss stage, Your Honor, we relied on the specific categories of fiscal impact in the auditor's study, and the private study merely is a rebuttal to the arguments made by the defense that these The relevant dollar figure would be the additional cost to Mississippi created by the directive. Is that right? That's correct, or rather the cost for the aliens that would be removed, but for the directive. What study do you have for that? And there, of course, it's impossible to study it. We simply have to maintain. We do have federal government numbers that show in the district, which is the New Orleans district office, which includes the state of Mississippi, removals were at $13,000 a year before the directive, and by fiscal year 2013, the removals were down to just over $8,000 a year. So the number of removals is plummeting, and that is due to the directive, and proportionately We don't know if that's due to the directive, though, do we? Well, we do, and the testimony of the ICE officers, which is in the record, and the affidavits which are in the record indicate that all the ICE officers were not permitted to substitute other illegal alien removals for the DACA recipients. They simply had to scale back entirely, and so it has been, and this is reflected in nationwide statistics as in the regional statistics, removals are down, and these specific aliens are prohibited from being removed, and these specific aliens are particularly costly because many of them are recipients of K-12 education benefits, and as we lay out in detail in our briefs, they are more likely to incur certain state public benefits costs. What about the argument that even if these agents were allowed to detain this particular class of aliens, there's no question that the agency has the discretion to cancel any removal action that's pending. So how do we know what the net effect would be? We have to assume, Your Honor, well, two things. We would have to, number one, we have to assume, Your Honor, that the agency would not, in an act of political anger, say, well, since the courts are forcing us to initiate these removal proceedings, we're just going to cancel the NTAs shortly thereafter. I think we have to assume that the executive branch pursuant to Article II, Section 3 would faithfully execute the law, but more importantly, the statute, there's actually a regulation that was passed according to the normal APA process that says, that lists seven circumstances under which an NTA can be canceled. There are only two that could possibly apply. One, that the circumstances have changed, but the circumstances won't have changed in a particular alien's case from the week he was issued the NTA to a couple weeks later. And the second circumstance is that the NTA was improvidently offered. It was improvidently issued. I would argue that if it's issued pursuant to federal law, one could hardly say that it was improvidently issued. I mean, the prosecutorial discretion extends to looking at the facts of every case, and they may consider the facts that are listed in the directive as critical. Well, Your Honor, actually, that prosecutorial discretion doesn't exist. If I jump ahead to the merits, to frame 8 U.S.C. 1225, the statute that takes away this discretion properly, we need to spend a minute looking at what Congress was thinking in 1996 when it passed the Illegal Immigration Reform and Immigrant Responsibility Act. There was a sea change in immigration law with that act. Congress was determined, and the legislative history reflects, that it wanted to end the catch-and-release policies of the mid-1990s. Every alien thereafter would be deemed an applicant for admission, and every applicant for admission must be inspected, processed, and placed in one of four tracks. There would no longer be a catch-and-release where the agency could take the alien and say, you're free to go. The alien had to be placed in one of four tracks, which are normal removal proceedings, expedited removal proceedings for aggravated felons, expedited removal proceedings of 1225 for other classes of aliens, and asylum proceedings. Any discretion could only be exercised through statutorily defined channels, and those statutorily defined channels are withholding of removal, cancellation of removal, temporary protected status, and you could argue asylum is also. The thing that's difficult to understand is that Congress has never funded this statute adequately to permit the statute to be enforced in accordance with its terms. Never funded it, not even close, and you complain about the catch-and-release policy. That all came about because we had a massive amendment to the statute, and we didn't fund, for example, no funding whatsoever to the courts. We create these cases, we widen the mouth of the funnel, and then the neck of the funnel, no money is put into that, no thought is even given to it, and there's simply no funding available to give this statute meaning, and that's a problem. With respect, Your Honor, I think I'd describe the situation slightly differently. Catch-and-release began before the 1996 Act. It began in the early 90s after Congress passed there was a bill or a policy to secure the borders, and it was simply never enough money to begin to do that, and there, to this good day, is not enough money. And may I give my second response, Your Honor, and that is the law does not say that the agency shall remove every illegal alien in the country. The law says that when an alien is in front of an inspecting officer, the inspecting officer shall detain and place the alien in the removal proceeding, one of the check tracks. So there's a common misconception that ICE is out there and that, informally, the INS is out there with vehicles, and they're roving around like state troopers looking for illegal aliens. They're not. They're actually sitting in their investigations, receiving leads, usually from sheriff's offices who have arrested an alien who's been accused of a crime, and they find out the person's an illegal alien. So the law can be complied with because there's this flow coming in, but the flow coming in is not enough to fill, to use up all of the budget. What the agency did before this current administration is the agency went out to employment places, launched investigations, and would But they can fully comply with the statute if they sit in the office and receive the calls from state and local police, but they're not even doing that now because they're receiving the calls and saying, oh, we can't deport him, or if the alien is brought in, as in the case of Plaintiff Martin, the alien is brought in and the supervisor says, let him go, even though he's just assaulted two federal law enforcement officers. So they can comply with the statute. Once the inspection occurs, once the contact between the ICE agent and the agency says, okay, you shall place him in one of these four, one of these four statutory channels. You can't just let him walk out the door. You have to track him. And there is, there is discretion, but it's only after the NTA is issued. And the threat by the defendants, well, they say, well, we'll just, you can't stop us from just canceling these NTAs after they've been issued. Well, if they are going to follow the law, and we would hope that they would, they would have to abide by the regulatory circumstances of canceling an NTA, and the regulations wouldn't allow them to wholesale cancel all of these NTAs. And I would at least hope that they would attempt to follow the law in good faith and the regulations. If I might jump back to the standing argument of Mississippi before we move entirely into the merits. And that is, there are three Supreme Court precedents that the defendants cannot get over when they try to claim that the Mississippi standing is not specific enough and is too contingent on a variety of factors. One is the identifiable trifle standard that comes from United States versus scrap in 1973. The court said that an identifiable trifle is enough for standing. So even if some of the economic burdens were mitigated by some of the factors raised by the defendants, any economic burden is enough for standing. Second is the sufficient likelihood standard in Clinton versus New York, where the Supreme Court said that some level of contingency doesn't mean that standing goes away. The challenged action need only quote, inflict a sufficient likelihood of economic injury to establish standing. And third, the special solicitude rule. This is from Massachusetts versus EPA, where the Supreme Court said that the state has a stake in protecting its quasi sovereign interests and quote, is entitled to special solicitude and standing analysis, end quote. You might say, well, what does that mean in practice, special solicitude? I would argue that it means when the standing determination is close, when a standing question has credible arguments on both sides, the court should err in favor of the state being quasi sovereign interests in our representative republic. Or to put it in baseball terms, a tie goes to the runner. In this case, a tie goes to the state in order to vindicate its sovereign interests and have its case heard in court. The defendants argued that the ICE agents in this case, the district court had no jurisdiction to hear their complaint because the ICE agents are precluded by the CSRA. But the CSRA's text is the biggest barrier for the defendants here, because the CSRA text makes it clear that it only applies to employment actions that have already occurred or have already been formally proposed. Yeah, but the regulation says threatened. Or yes, and then the 2012 amendments say threatened to occur. But as I understand the ICE agents' argument is if they apply the law, they're faced with the possible sanctions in their employment. That's correct. So why wouldn't that go to the CSRA? Well, because the way the MSPB has interpreted the CSRA since those 2012 amendments occurred has been there has to be more than just an unstated implicit threat. There has to be an express threat by a supervisor saying you must do this or you're going to be canned, or you must do this and these consequences will flow. They have an appeal from that ruling like that. We have taken, in good faith, taken the district court's holding that we should go to the CSRA and attempted to do so. The district court said, first, we can just go directly to the MSPB. The MSPB did not agree with the district court said, no, if you're going to come here, you first have to go to OSC. So we went to OSC. And as we have briefed this court, OSC said, we have no jurisdiction to give you anything here. We cannot provide the relief. The letter is in your briefing. We cannot provide the relief you asked for. The best you can do at this point is go back to the MSPB and ask for corrective action. Well, there's an appeal that was live, and didn't the MSPB say, you've got to go to the OSC first? Right, which we did. Yeah, so you have an appeal pending on the MSPB? And now we're back with the MSPB. But OSC's position, which is the federal government's argument right now, and it's interesting, it's the exact opposite of what's coming out of the federal government's mouth here in this case, is they're saying you have no jurisdiction, the MSPB, you have no jurisdiction because the relief these plaintiffs seek is a relief the MSPB cannot give. They're seeking a declaratory judgment, an injunctive relief. The MSPB can only give so-called corrective action. Well, you can appeal that. Well, but we'd be appealing the clear meaning of the statute. Corrective action is defined in the statute to include certain things like back pay and restoration. The Elgin case said you could appeal the failure to give constitutional relief to the federal circuit. Right, but the constitutional relief at issue in Elgin was, in my specific employment action, where my employer did something to me, I'm arguing that in this specific instance, my employer violated one of my constitutional rights. And so the federal court of appeals could say, yes, you did violate his constitutional rights, and so you should give him back pay. But the difference here is, if we go to the federal circuit, and the federal circuit agrees with us on everything, the federal circuit can't order the MSPB to issue an injunction. Or issue some split-ups, can't they? The MSPB has no injunction. No, no, no, the circuit court. That's an interesting question, Your Honor. I'm not aware of a federal circuit issuing the injunction itself and not directing a lower court. Our view has been that the federal circuit has no power to, they can only ask the lower court to issue the injunction. Well, they can rule on the constitutional question. I don't know why they couldn't issue an injunction. Your Honor, I think that it would be very difficult for it. Normally, it would be the district court that is commanded to proceed with an injunction rather than the federal court of appeals itself issuing it. I see that my time has expired. You have time left for rebuttal. Thank you. Thank you. Mr. Clare. Thank you, Your Honor. Good morning. May it please the Court, I'm Jeffrey Clare. I'm Justice Department Counsel for the Secretary and the other federal appellees here. Your Honors, I'd like to turn immediately to the question that the State of Mississippi's standing can bring suit, and I think Your Honor's questions this morning have hit upon the central defect in the State's claim. It is not sufficient for the State to make a general claim that there are costs associated with having undocumented aliens within its borders. It, here in this litigation, challenges some specific policies and memoranda, and it is up to the State to carry the burden of showing that those costs, those policies, somehow exacerbate the cost to the State of having undocumented aliens within their borders. And as the district court found, this burden the State simply did not carry. They deduced evidence with their complaint in an auditor study conducted by the State auditor. They set it to some private studies. All these studies, as the district court noted, in fact, predated the policy that is challenged here. Moreover, the policy here is not, as you know, a policy of not deporting certain aliens. It is a policy of conserving limited federal resources and prioritizing their use so that the aliens who are least likely to burden the State, least likely to pose a problem for law enforcement purposes, least likely to pose a threat to public safety, are not the focus of the government's enforcement resources. Those enforcement resources are instead intended to be dedicated to pursuing aliens who are more likely to burden the State with some costs. I mean, isn't it logical to infer that the more aliens Mississippi has, the more it's going to cost them? I think as a general proposition that might be so, but again, we're dealing with a specific policy that concentrates on a specific group of aliens and takes enforcement resources away from pursuing those aliens and dedicates it to pursuing the aliens who are more likely to cost the State money. These are aliens who have long-term contacts with the United States. They are, by the terms of the policy, likely to have been here for a long time, to be more assimilated, to be educated, to have completed military service, to have the kind of background and circumstances where they are more likely to be able to gain employment. Indeed, part of the policy is to help them gain lawful employment in these circumstances. And on the other side of the coin, you have the reason why resources are shifted away from these aliens is a very clear and specific intent on the part of the government to pursue aliens who are likely to commit crimes, who pose a threat to national security, who pose a threat to public safety, who are more likely to burden the State with some cost. The net cost is really a matter of speculation. There are certainly costs and burdens on both sides of the equation, but that again does not help the State. It is the State's burden to establish their injury. The district court found below, the district court made a factual finding below, the State had not carried that burden, and I think it's important to bear in mind the procedural posture in which the district court made that determination. It was the plaintiffs who induced evidentiary material to their complaint. It was the plaintiffs who, in responding to the government's motion to dismiss, appended to their response a set of affidavits going to the question of injury. It was thus the plaintiffs who invited the district court to make factual findings on this matter. The district court did so, and I submit that those findings can only be set aside here if they are clearly erroneous, and the plaintiffs have not submitted anything demonstrating that they can meet that stringent burden on the appeal. Moreover, I'm saying at this point it would be impossible for Mississippi to meet that burden, I guess. Well, I hesitate to say impossible, Your Honor. I'm confining my remarks to the record that was created below in the district court's finding. On this record, the State simply did not carry its burden. Moreover, there are some general considerations that make a State a particularly inappropriate litigant in this area. As this Court has recognized in the Texas v. United States case we've cited in our brief, as the immigration is a matter that is generally committed to Congress and the executive branch of the federal government and is largely in the interest of judicial control. The Supreme Court has noted in several instances the importance of preserving the primacy of the federal government in this area, the importance of having the federal government speak with one voice on this matter, the necessity of having the federal government be able to deal with things like the impact of immigration policy on foreign relations, the problems that our own citizens might encounter in other countries based on how we treat aliens who are here. All these matters suggest that the Court should regard with some skepticism, initially a claim by a State seeking to challenge federal immigration policy. Moreover, in this area, you are dealing with, as Your Honors have noted, an area where the government has wide latitude in deciding how to use its enforcement resources and which aliens to pursue for removal. My opponent notes that there are statutes that constrain the government's discretion in this area. If they are, they have escaped the Supreme Court on two occasions. The Supreme Court has said not once but twice that the federal government has discretion at every stage of the removal process, running from the decision to begin the removal proceedings in the first instance all the way through executing a final administrative order of removal. Those prosecutorial determinations are particularly unsuited for judicial review. The Supreme Court, in Heckler v. Cheney, said, as a general matter, these kinds of enforcement determinations are presumptively unreviewable. And this Court, again in the Texas v. United States case, noted that it simply could not find judicially manageable standards for evaluating a claim that the federal government has been too lax in enforcing the immigration law. So for that reason as well, the state of Mississippi should not have standing. Turning briefly to the other group of plaintiffs, the immigration officers who are plaintiffs here, again, as the District Court concluded, it had no jurisdiction over those claims. Congress has created, in the Civil Service Reform Act, a exclusive and detailed remedial scheme for providing administrative review of employment sanctions directed against federal employees. And in many instances, further review of those administrative positions on an Article III court, the federal Supreme Court twice again has made clear that this is intended to be the sole and exclusive means of pursuing claims that some sort of employment sanction levied against a federal employee is unlawful. What the Court stressed in Fausto was that the scheme is intended to be exclusive, the scheme is intended to centralize these kind of employee disputes in expert, administrative, and judicial form, and does not accommodate suits outside that system. The Court reiterated that holding in the recent Elgin case, where the plaintiff alleged that because the administrative process could not address a constitutional claim, that claim should be heard in the District Court. And the Supreme Court again said, no, the scheme is intended to be exclusive, even when a constitutional claim is raised that is beyond the institutional competence of the Merit Systems Protective Court. That constitutional claim can be heard on judicial review by an Article III court. And therefore, the scheme remains exclusive, even as the constitutional claims as well. What about a situation here where both the Board and the Special Counsel declined jurisdiction? What's the effect of that? Well, Your Honor, I don't think that's quite an accurate characterization of what happened. The employee has a statutory right to bring a claim that he's being disciplined for failing to carry out an order that would require him to violate a law. Those kinds of claims go first to a body called the Office of Special Counsel, which reviews and makes a determination as to whether further action is appropriate. If the Office of Special Counsel concludes that no further action is appropriate, then the employee has an appeal of right to the Merit Systems Protection Board. And if the Merit Systems Protection Board does not grant relief, the employee has appeal of right to an Article III court. The Federal Circuit do have one of those decisions from the Office of Special Counsel appended to the yellow responsive brief from the plaintiffs. It says, because the employee alleged a violation of Section 2302B9, he may have a right to seek corrective action from the Merit Systems Protection Board under the Civil Service Reform Act. And that is indeed what is happening here. There is an appeal to the Merit Systems Protection Board. Where does that stand now? There are. The government has asserted that the Merit Systems Protection Board cannot hear this for a number of reasons. One is a sort of technical reason that the statutes that created this particular administrative right of action, this whistleblower action, do not apply to conduct predating the enactment of that statute and the conduct alleged by the plaintiffs, in fact, predates that statute. And another is that the Merit Systems Protection Board doesn't have the authority to grant the kind of relief that the plaintiffs seek. Whether the Merit Systems Protection Board will agree with that is, of course, a matter that is committed to the Merit Systems Protection Board. Even if they agree with the employer government's position in that case and find that there is no such remedy, that again does not help the plaintiffs. Because the ruling in FASFA, the ruling in Elgin, is that the employee gets whatever remedies the Civil Service Reform Act provides. If the Civil Service Reform Act does not provide a remedy, that means, according to the not that there is a remedy in this report, but Congress intended there to be no remedy at all. Even if, I'm sorry, I missed you, you said they're taking the position that it doesn't apply to these actions because they predated the amendments? Yes, the provision that... If it doesn't apply, how can it be an exclusive remedy? Well, it is a particular kind of claim for an in particular employment sanction. If the conclusion is that the particular claim for a particular employment sanction is not cognizable under the Civil Service Reform Act, under the Supreme Court's ruling in FASFA, what that means is Congress did not intend to. Well, I thought you said because it predated. But it's... It should have intended for claims... That doesn't make sense. Well, let me try to clarify, if I might, Your Honor. There is currently in the Civil Service Reform Act the provision that says, if you are threatened with discharge for failure to sanction, that would violate a law that is called a prohibited personnel action, and there is a right of review through the Special Counsel and the Merit Systems Protection Board. That is a recent statutory amendment, and I believe it was enacted in 2012, and there is an argument now before the Merit Systems Protection Board that this independent right of action, which enables an employee to pursue the claim regardless of what the Special Counsel does, does not apply to any kind of conduct arising before 2012. If the government is right about that, if there is no remedy for such conduct before 2012, what that means under FASFA is that Congress, for that conduct before 2012, did not intend there be any remedy. Not that... Not only that the Civil Service Reform Act doesn't apply, but because the Civil Service Reform Act is intended to be whether the Merit Systems Protection Board finds that this is a cognizable claim or not. Because, again, under FASFA and ELEGENT, the remedies Congress provides are the only remedies you get for an employment sanction. Well, it's one thing to say that they decide there's no cognizable claim, but it's something else to me to say, if they don't have jurisdiction, then... In other words, you're saying here that these agents have an alternate remedy. They can go to the... And then you... Now you say to the Board, yeah, but you don't have jurisdiction. That's a problem. Again, Your Honor, the Board hasn't decided this question. This is a matter of it's committed to the Board. It's an adjudicatory body with the power to make the final administrative decision over the scope of these kinds of claims. We can take a position as defendant in these actions, but it is the Board that decides whether the claim is cognizable or not. But what if they say no jurisdiction? We're not even looking at cognizant of that. We're saying no jurisdiction. Well, I think, Your Honor, what they would say is that the statute does not cover the conduct at issue because it predates the enactment of the statute. I don't know whether they would characterize that as a jurisdictional holding or a merits holding. But again, either way, if it is a sanction arising out of the employment relationship with the federal government, the only remedies an employee is afforded are the remedies provided by the Civil Service Reform Act. Now, this court in the McAuliffe case had a similar sort of situation where there was a group of employees. They were called non-appropriated funding instrumentality employees, a special kind of government organization where the Civil Service Reform Act did not apply at all. It had no remedies at all. And the court said what that indicated under FAUSTA, this court said, what that indicated under FAUSTA was the absence of remedy did not mean there was a remedy in order to intend to provide a remedy at all. That follows directly from the FAUSTA case. FAUSTA was another case where there was a group of federal civil service employees that were called accepted service employees. At that time, when the Supreme Court ruled in that case, those employees had no remedy at all under the Civil Service Reform Act. And what the court said there is that silence is not indicative of some oversight on Congress's part. That silence is indicative of the intent not to provide any remedies at all. And that's the case. JUSTICE KENNEDY Of course, we've got that Leedem v. Kine exception. So there are other possible remedies. JUSTICE BREYER. Your Honor, the exception doesn't apply here because, as the Supreme Court has made clear, Leedem v. Kine, in order to invoke that exception, the Leedem v. Kine exception, the courts of appeals and the Supreme Court has made clear, is an exceedingly narrow and rarely invoked kind of jurisdictional basis. It is not appropriate where there is simply a disagreement about how a statutory scheme is construed. It can only be based on an assertion that an agency is acting in an ultra-virus fashion and a sort of notion that any time the agency has made an error in construing a statute, that's an ultra-virus action. That would swallow the exception, the Leedem v. Kine, the rule rather than the exception. Moreover, the Supreme Court has stressed that it is not appropriate where there is an alternative avenue of review, where there is some sort of judicial review available. And for that reason as well— JUSTICE KENNEDY But you're saying there is no alternative. JUSTICE BREYER. Your Honor, our position is that the question of whether there is a review available is still pending before the Merit Systems Protection Board. Even if the Merit Systems Protection Board decides there is no review, that would mean there is no review under the statute. And if there is no review, that in itself will not trigger the Leedem v. Kine exception because you would really have a dispute about statutory construction, whether the agency is correct or not, and its interpretation of the statute doesn't amount to an ultra-virus action. And I would cite to the Court the circumstances that pertain to the Leedem v. Kine itself. There the National Labor Relations Board certified as a bargaining unit a group of employees who the statute plainly did not permit to be certified as a bargaining unit. And the NLRB, in fact, admitted that it had no authority to certify those employees in the bargaining unit. And it went forward anyway, and there was a statutory provision that purported to foreclose all judicial review of the NLRB's bargaining unit determinations. There you're having a situation where the agency simply had no statutory authority to act. This is not that kind of situation. The Supreme Court has made clear that the agency has authority to make decisions as to the allocation of its prosecutorial resources throughout the removal process. The agency is and the dispute as to whether the agency has done so correctly is not the sort of dispute that ought to be considered an ultra-virus action that would warrant a Leedem v. Kine jurisdiction. It is, as the Courts of Appeals have unanimously asserted, it is a narrow, rarely invoked exception. It rarely comes up. If the acts alleged would occur again tomorrow, would there be jurisdiction or would there be a remedy if the employees were discharged or sanctioned? Your Honor, it would certainly, the statute that finds this as a prohibited personnel practice would certainly apply in that circumstance. If there was a threat today that could be construed as a threat to take employment action for an employee's failure to undertake action that would violate a law, that would be covered by the statute today. And one of the things the MSPB said is that among one of our positions before the MSPB is not only does the statute not apply to this antecedent conduct, but there is in fact no right concrete threat that would be actionable in the first instance. It's simply not a kind of right controversy at this point. Well, what do you say to the statute that counsel referred to cabineting the agency's discretion? Well, the first is, as I've noted, Your Honor, the Supreme Court has decided twice with knowledge of those statutes, or at least when those statutes were in effect, that the agency has discretion throughout the removal process. But they didn't speak to discretion with a matter like this. Not specifically, Your Honor, but they did talk about the kinds of discretion that the agency has in carrying out its enforcement functions, and said in rather clear terms that this is a kind of discretion that exists at every stage of the removal process, from the beginning, from the decision whether to commence proceedings, all the way through the decision as to whether to amend it. This is the first cause of action. And plaintiffs themselves are not saying that this statute, 1225B2, in fact compels removal. What they are saying is that it compels aliens to be placed into removal proceedings, and thereafter, as they say, prosecutorial discretion can only occur after an alien has been placed into removal proceedings. Well, what that means is that statute does not place the government under any kind of constraint to actually remove someone, even under the plaintiff's interpretation of this statute. All it does is require that proceedings be initiated. Now, we don't agree with even that interpretation of the statute, but even taking the plaintiff's claims at face value, this is not a statute that purports to direct the government to remove anyone. Your Honors, I'd be happy to answer more questions at this time. Okay, thank you very much. Okay, Mr. Kobach, back to you, sir. Your Honor, I'd like to quickly go through some of the points made by opposing counsel. The standing of the state of Mississippi is not just the large dollar figures we're talking about. It also rests on the fact that the state must modify its procedures in administering Medicaid, administering state benefits, and as this latest 28-J letter exchange indicates, perhaps even in the way it administers its driver's licenses. The allocation of resources in the changing of procedures is also an injury in fact. Specifically, the defendants say, well, this directive allows ICE to conserve resources, and that's all it is. It's just a reallocation of resources. Justice Scalia rejected that exact argument in Arizona versus the United States. He filed the decision right about the same time in June that the directive was issued, and Justice Scalia said at page 2521, the husband of serious resources can hardly be justified for this since the considerable administrative cost of conducting as many as 1.4 million background checks and ruling on the biennial request for dispensation that the non-enforcement program envisions will necessarily be deducted from immigration enforcement. Justice Scalia described it as, well, every affidavit before the district court, and all of them are on the record before this court, and every testimony from the ICE witnesses says there has been no shift in transfer of removal resource to putting other aliens out. Rather, there has just been the stopping of the removal of anyone who asserts, doesn't have to prove it, asserts that he qualifies for DACA. The defendants then say that, well, the statute provides for this discretion, and that's the only plausible way to read the statute. Well, 1225 says, if the examining officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for proceeding under section 1229A. Now, they say, well, Arizona versus the United States mentioned discretion. Indeed, it did. Arizona versus the United States mentioned in passing the broad discretion exercised by immigration officials, end quote. What they failed to mention as we provide in our brief, Arizona made clear that any discretion to be exercised was according to law. Congress has specified which aliens may be removed from the United States and the procedures for doing so, end quote, and the court again said it's according to the procedures under law. Where this specific statute has been at issue, which was the case in the First Circuit in Sucker versus Ashcroft, the court held that it is a mandatory duty. Shall means shall. It does not mean may. What about the Heckler v. Cheney case where the statute said you shall, and the court said that doesn't indicate that you removed the prosecutorial discretion. Right, and in that case, the Heckler court looked at the surrounding context and said, no, there was intended to be prosecutorial discretion, but the Heckler court did acknowledge and said where the words of Congress indicate that discretion has been removed, discretion has been removed. We've got shall in both statutes. Right, and I would argue if you look at the Heckler case, especially where the Heckler case goes into Dunlop v. Bachowski, and the court said here's an example where shall really does mean shall, and they go into Dunlop v. Bachowski, which is much closer to the case we have at bar. In the Reno case, the court said prosecutorial discretion in the criminal context is magnified in the deportation context. Well, in Reno, the court mentions the deferred action discretion that the defendants want to exercise, but mentions that in the context of saying, and this is why Congress acted. Looking back, Congress saw this deferred action being used, and Congress therefore acted to confine it. Now, the essence of their position in their briefing is that the use of the term shall for this course to give shall its normal meaning would be absurd and wasteful of resources because they would be forcing an agency to remove aliens that the agency does not wish to remove, but that's exactly the point. Congress was unhappy with the political leadership of INS at that time, and so Congress inserted a very firm ironclad commitment that you must remove these aliens. The defendants now want you to change the law for their benefit and change the law so that shall means may. I understand you're saying that the agents must detain. You're not saying they must remove. It says that the agency shall detain the alien for a proceeding under section 1229A of this title, and that's a removal proceeding, so you are to detain them for the purpose of entering the removal proceeding. Didn't you pretty much concede that in your brief that the agency reserves prosecutorial discretion in who they remove? No, at that point, the alien has only the discretion to what they do. Yeah, they have the form of discretion called cancellation of removal and withholding of removal, but both of those are defined in statute, and they're limited in statute. So sure, the agency can exercise a statutorily defined avenue of discretion, but they can't just do this deferred action wholesale as they would like to do. If I could just very quickly go to one final point. Judge Davis and Judge Owens, you are right when you said, you suggested that the defendants are trying to have their cake and eat it too. They are saying that the MSPB is correct, that it has no jurisdiction because the 2012 amendments came after the directive at issue at this case, and so they're saying there is no avenue for meaningful judicial review. Therefore, the Leedem v. Kine exception applies. Leedem v. Kine exception to preclusion applies when there is no meaningful avenue for these plaintiffs to get their judicial review, and it is a violation of the agency's powers on the face of the statute. We are making a violation of the powers. I mean, it's an ultra-virus act. And we absolutely are claiming that this is an ultra-virus act. The agency has no authority to issue a nationwide proclamation that 1225A is not going to be followed anymore. In the text of the directive, it says, you may not place these aliens in removal proceedings. In the text of the statute, they must place. One final point, and this is my final point, 1225A is really unusual. The entirety of immigration law goes to the Attorney General. The Attorney General shall, or the Secretary of Homeland Security shall. Only in this particular section did Congress go to the immigration officer and reach down past the chains of command all the way to the line officer and say, you, the immigration officer, shall initiate removal proceedings and detain the alien. That's unusual, and we submit that is because Congress was tired of the catch and release coming from above, and they ordered the direct immigration agent to do something, and that cannot be taken lightly. Thank you very much. Thank you. We have your case.